May it please the Court, James Del Sordo for the appellant, Chapman Law Firm. Your Honors, this matter is an appeal from a bid protest at the Court of Appeals for the Court of Federal Claims. Excuse me, I apologize. Essentially what we're asking the Court to do is overrule the Court of Federal Claims' assertion that it was not arbitrary and capricious for the contracting officer in that matter, in that procurement, to rely on, for HUD to rely on an offeror's assertion of intent to comply with the subcontracting limitation clause in the RFP. In the face of clear statements in the offeror's proposal that it could not or would not comply with that limitation. Essentially we have a contract that is set aside for small businesses. It's undisputed that the RFP contained the subcontracting limitation clause, which is FAR 52.219-14, which requires that a contractor who wins such a set-aside contract perform at least 51% of the total contract effort. And it's also undisputed that the technical evaluation panel, in initially looking at the offeror's proposal, said, we can't determine whether you're going to comply with this rule or not. And there became a lot of back and forth between the offeror and the government for the offeror attempting to assure the government that they were going to comply. And in the end, the offeror says, yes, I'm going to comply. However, at the same time, further on in their final proposal revision, they're stating that they're going to need a waiver of certain Small Business Administration rules if they don't get a particular type of mentor-protege program in place. Now, obviously, you don't ask for a waiver of something unless you consider yourself in violation of it. And just based on that, the contracting officer or the technical evaluation panel should have realized they could not rely on the blanket assertion,  Similarly, they looked at the contract, the offeror's initial operating costs, which demonstrate quite explicitly that the subcontractor was going to perform more than 51%, close to 59% of the labor effort on this contract. And as the Court of Federal Claims has stated, in a recent case called Transatlantic Lines LLC versus United States of America, it's 68 federal claims, 48. That's a 2005 case from last September. What is the status of the contract right now? The contract that was awarded to HMBI, the offeror, I presume, is being performed. Now, it was initially stayed when we protested at the Government Accountability Office. I believe it was not stayed because the government, once we finished at the GAO, the automatic stay went out of place. The Court of Federal Claims initially held off performance for a period of time, but it has been performing since, I guess, the fall, or actually a year ago. The fall of 2004? Yes, Your Honor. So it's been in place for a while. It has, Your Honor. But that's the nature of the—that's why we like to win these things at the Government Accountability Office with the automatic stay, but it's the nature of the beast that takes time to process these things. But really, to rule in your favor, don't we have to, in essence, say that the government acted arbitrary, capriciously, without good reason, by relying on the representations and assurances that it had at the time, namely when it got the final proposal in response to the questions it sent out? Because it did send out a communication saying, look, we have a concern about your relationship with—what is it? The best assets, Your Honor. Best assets. I'm sorry. We're concerned about this relationship. Are you going to comply with the contract? They come back. They point out that there's a provision in the contract that says that they'll comply and so forth. I mean, aren't you asking us to overturn that kind of a decision, and wouldn't that open up the door for a lot? Not really, Your Honor, because I wholeheartedly agree that the contracting officer is not an inspector general whose job is to go out and pry through the interstices of a proposal. They're entitled to rely on the statements on the face of the proposal. However, what we have here is a general statement. We're going to comply with FAR 52.219-14. But within the same document, you have statements that utterly contradict that, one being that we're going to need a waiver of the limitation on the 50 percent rule. It depends how you interpret those statements, doesn't it? Excuse me, Your Honor. It depends how you interpret those statements. If you interpret those statements as meaning we've got a problem during the first six months of performance, there's no inconsistency between the two. Isn't that correct? Not necessarily, Your Honor, because, first of all, there's no waiver within the case law saying that, well, if you're not in compliance for the first six months, it's OK. No, but just try to answer my question. If, in fact, those statements are interpreted to mean we're not going to comply during the first six months, but we'll comply with the contract overall, there's no problem, right? No, Your Honor, because, one, you can't interpret their statements saying this. No, no, but you're disagreeing with me about the interpretation. I'm saying accept that interpretation. There's no problem. There's no inconsistency. I know you disagree with that. You really do disagree with that. I understand that. But if the other statement is read as saying we're talking about the first six months, then there's no inconsistency. There is an inconsistency, Your Honor, because there's not a, you can be in noncompliance in the first six months, but be in compliance in the latter six months. The contract is a meeting between the two parties. The offeror has to meet all the material requirements in the RFP. One of the material requirements is the limitation on subcontracting. There are many instances where the RFP might say you have six months to comply with whatever, you have 90 days to comply with something else. In fact, in this RFP, there was particularly a 120-day transition period where not all the services were being performed. However, there is nothing to say that this limitation on subcontracting is something that's subject to some sort of transition period. Okay, but you're disagreeing with my hypothetical. My hypothetical is we reject that. We say this should be interpreted as applying only to the first six months. If that's true, there's no inconsistency, right? Your Honor, then you're overruling the President. The answer is there's no inconsistency. If it's interpreted that way, you don't want it. You say that's wrong, and I understand that. I guess I don't understand the question. The question is hypothetically if they said we're not going to comply for the first six months. That's not inconsistent with compliance for the entire contract period. Then their proposal should be rejected for being noncompliant with the RFP, Your Honor. Within the Federal Procurement Law, you cannot say give me a pass for six months. Well, Mr. DeSource, the whole contract is a whole. How long is it? What's the period of the contract? Well, there's a base year and then option years after that for option years. And there's no guarantee that any option year would be afforded. No, I understand. But I mean it's the whole period of the contract. I mean there may be theoretically there could be one pay period or something when someone is noncompliant literally with the 50% requirement. Don't you have to look at the whole contract in total? I would agree with you, Your Honor. If we had that situation where it was just a potential that maybe somebody quit, someone from Harrington, Marin, and Barksdale, the prime contractor quit, and then the best assets person would have to maybe fill in. But that's a situation for administration of the contract. It's not something to do with formation of the contract. When we're talking about formation of the contract, we have to have a meeting of the minds between the parties. The government says, and it's RFP, you must comply with this limitation. To allow someone within the body of their proposal to say, I'm not going to comply with this limitation, is to, one, give them an unfair advantage as to all the other options. But, Your Honor, they're saying that. They're not saying they're not going to comply. They said they will comply. They will comply. That's the same thing as my son saying to me, Your Honor, I'm going to clean up my room. And then I know he also says, but I'm going out to play now. Your Honor, you can say I'm going to comply, but if you also say, particularly in your labor hour figures, which are the hard data. Well, but if you say you're going to clean up the room, you have to clean up your room sometime this week, then if he goes out and plays today, he's not out of compliance. He can do it tomorrow and still comply with your requirement, right? If that's what the RFP is. That's what's going on here. They have to comply within the term of the contract. They don't have to comply tomorrow. They don't have to comply the next day. Sometime within the term of the contract, they must be under that 50%. That is the point of the case law that talks about this being an administration of the contract issue. But my first principles is that if you say within your proposal, I cannot comply with this limitation, not limiting to any time period, just saying I cannot comply with this time, with this limitation. I need a waiver of this 50% limit. It doesn't matter if in actual practice you're going to comply. The contracting officer has to live with what is stated in the proposal. I have reserved five minutes. Let's save your rebuttal time. Thank you, Your Honor. Mr. Del Sordo. Mr. Haberbach. Thank you, Your Honor. Good morning. May it please the Court. I'd like to begin by addressing Mr. Del Sordo's assertion that HMBI had utterly contradicted its representation. It did not utterly contradict its representation that it would, in fact, comply with the limitation on subcontracting. Neither the allocation of costs nor its statement concerning its intent to seek a waiver of the mentor-protege agreement speak to the question, which is germane to this case, which is, as the Court indicated, whether throughout the life of the contract at least 50% of the cost of contract performance incurred per personnel should be extended and expended for employees of the concern. The relevant issue, as the Court has discerned, is not whether in the first 30 days or the first 60 days I'm sorry, the first 90 days or the first 6 months of contract performance, whether or not the cost would be 50% or greater, but rather over the full year. But your argument is that this should be viewed as a 6-month limitation because that was the only SBA requirement, right? Your Honor, the SBA requirement is not actually part of this contract. Well, no, I understand, but isn't that your contention that the SBA is only concerned with the first 6 months? I thought that was the point you were making. The SBA regulation refers to 6-month increments. But, for example, on page 1456 of the appendix where the HMBI made the statement, the question is being asked in the context of initial operating costs. And there is no statement that after the first 6-month period that we're going to need a waiver. But rather in the context of what's being asked here is we have a concern about operating costs. What are you going to do about them? And the response is made that in reference to the initial operating costs, we may not receive a waiver. But by no means is that a suggestion that throughout the life of the contract, more than 50% of the labor costs would be incurred by the subcontractor. It's also important to point out that the first 90 days, which is the basis for the breakdown of costs, are not at all reflective of what has to be performed during the typical periods of the contract, particularly if one looks at the contract as one lasting for a period of years. There are a series of ramp-ups that take place during the first 120 days such that the full effort of the contract, including the primary tasks for which HMBI is responsible pursuant to its subcontracting arrangement, don't really get started until either, depending on how one looks at it, 90 days or 120 days after the award. In particular, the marketing activities for which HMBI is primarily responsible don't take place until after day 120. So it's certainly not surprising to find out that during the first 120 days or the first 90 days that a large portion of HMBI's costs won't have been accounted for during an explanation of its initial operating costs. But this language they're relying on, on page 13 of the blue brief, this is their primary reliance. The cost sheet that you've shown is explicitly only for the first nine months or something like that. Ninety days. Ninety days, yes. But they say this language at the bottom, they quote at the bottom of page 13 of the blue brief, shouldn't be read as applying to the first six months of the contract, as you say it should, right? That's my understanding, Your Honor. So could you tell me again why we should read this statement as limited to the first six months? The primary reason is that the statement from which they're quoting on page 13 appears in two places. There are two sets of final proposal provisions, but the statement is the same. And in each question being asked by HUD is under the caption initial operating cost, and there is a question raised about the initial operating cost, and it's within that specific context that HMBI responds we may need to seek a waiver. And what page does that appear on? It appears on two pages. The one I have before me is 1456. 1456. Okay. And why does initial operating cost mean first six months? Well, in fact, the initial operating cost, as it's referred to elsewhere, the question that HUD asked about was, in fact, the first 90 days, which will only be three months. The first 90 days, yeah. And HUD— So you say this should be read as limited to the first 90 days. I can't say that they necessarily put a pinpoint as to how long that period would last, but they were concerned that for the first six-month period, the accounting might come out such that more than 50 percent during the initial six-month period would be incurred by subcontractors. It's also, I think, important to note that the statement that HMBI makes isn't we're going to need to do this. What it says is if the SBA does not approve the mentor-protege relationship, HMBI requests permission from the SBA to exceed work requirement percentages for an SBA firm.  And HMBI could have acted accordingly by rearranging what it needed to do. I think it's necessary to— Is there a distinction here between the limitation on subcontracting and the small business concerns? The small business, the SBA provision, that's just a preference in the contracting. Isn't that correct? Whereas the limitation on the subcontracting is a requirement of the contract. It seems to me like Chapman here is trying to raise concerns that are relevant to its small business preference and import them over into the concerns about the contractual limit on subcontracting. Am I correct? I think that's an entirely accurate understanding. It is not necessary for purposes of this contract for HMBI to comply with the 8A requirements. And that whole body of jurisprudence— That's just a preference. They get a preference if they hit the right small business numbers, right? They would, although this speaks to the 8A requirements. And this is not actually an 8A set-aside, such that it's only a small business set-aside. And the regulation that's being referred to here relates, I believe, solely to an 8A set-aside. So on some level, the court is entirely correct in suggesting that this is irrelevant because it's on the SBA side as opposed to on the contract side. But it's even more—if that could be the case—more irrelevant because it's not even an 8A set-aside to begin with. The other thing that I think bears noting is that it's entirely appropriate to read the representation that HMBI makes concerning its anticipated initial operating costs in the context of and in accordance with its representation on the previous page that it intends to comply with the limitation on subcontracting. On page, I believe it's 1548, HMBI makes its representation that it plans to employ at least 50% of its personnel. HMBI management team will review total costs incurred on personnel quarterly to ensure that our employees are performing at least 50% of the costs expended. HMBI—Mr. Del Sordo has suggested that the breakdown of costs to be incurred somehow contradict that, but I think a much more appropriate reading is to simply try to harmonize them and to give the HMBI the benefit of the doubt in suggesting that what it says on one page is consistent with the thing it says two paragraphs later. At a minimum, the contracting officer did not act arbitrarily or capriciously in trying to harmonize these two provisions because the fundamental inquiry that the court needs to examine is whether or not it is clear on the face of the proposal that there is simply no way that HMBI can comply with the limitation on subcontracting. HMBI was in a position to comply with the limitation on subcontracting. It made the representation, and to suggest otherwise, would place the contracting officer in a position where it needs to somehow try to predict the future and replace the government in the position of— if Mr. Del Sordo's position were correct—of deeming potential bidders not capable of performing long before they've been given a chance to do so. Such a ruling would, number one, create an insurmountable burden for the contracting officer, but number two, would subject the United States to all kinds of potential litigation concerning an improper disqualification prior to the time that the contractor would give it a chance. I have nothing further than that if the court has any additional questions. Thank you, Mr. Auerbach. Mr. Del Sordo, you have more than four minutes. Thank you, Your Honor. We wholly agree that this 8A issue is irrelevant as to this contract, except to the extent that it shows HMBI's intention. We're not attempting to say that this was some sort of preference contractor, that it was an 8A contract. The point is that HMBI made a mistake and assumed that there was some sort of 8A component to this contract. And in making that assumption, it made an admission that it was not going to be able to comply with the 50% rule. So whether the fact that they made it in the context of an 8A clause or something is irrelevant, except to the extent that it shows their intention. And that's what we're talking about here. They make a statement, we're going to review our operating costs every quarter to make sure that we're okay. But they say right there, if we don't get this men are protege thing, we're going to have to get a waiver of the 50%. Similarly, the only issue about the initial operating cost is that it is a window into the black box that is the relationship between the subcontractor and the contractor. The way the proposals were set up is that you didn't have to give your breakdown on your costs. However, in this one instance, the government asked the offeror, you know, your initial operating costs seem a little high. There was just a raw number that was given. So they break it down. And it's a simple arithmetic procedure to see that the subcontractor is, because the fee that's being paid to them is X, the initial operating costs are Y, that it's more than 50%. Now, I understand it's only the first 90 days, but it is a ratio. It should tell the government something, that the subcontractor is going to be doing more work than is appropriate. And I agree wholly, and everyone agrees, that the contracting officer is not tasked to pry into every nook and cranny of the proposal. But when there's something stated clearly on the face, and this is the GAO's precedent says this, and Judge Hewitt said it below, and also the Transatlantic Lines case repeated this, that the contracting officer is fully able to rely on a statement. However, if there's a contradiction, or if there's something clear on the face of the proposal, that they are not going to comply with the limitations of subcontracting, that that cannot form the basis for a successful work. Now, I understand Judge Schall's concern about the fact that a lot of water is flowing over the dam between here and now. Obviously, my client's preference would be that you overturn Judge Hewitt's decision, enter an injunction, require the contracting officer to do something further. However, in the alternative, we have asked for relief under the implied contract of fair dealing. There's also been proposal costs that could be rendered. And I bring up the implied contract of fair dealing because there does seem to be some sort of disagreement at the Court of Federal Claims whether that cause of action still exists. Between the Lion-Raising case and the Unified Architecture case, it would be helpful if this Court would opine on whether that cause of action still exists at this point. However, just to sum up, Your Honors, the fact that someone states, we're going to comply, and it's contradicted two pages later, or even somewhere else in their proposal, cannot form the basis for a successful board, and we would ask you to overturn the Court of Federal Claims in this instance. Thank you. Okay. Thank you very much, Mr. Del Sordo. The next case is Arrow Products International, Incorporated v. Intex Records.